Boyer *v.* Pitt Publishing Company, Appellant.

Argued October 9, 1936.   Before SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

*Lawrence D. Blair,* with him *M. H. Ewing* and *Moorhead & Knox,* for appellant.

*Elverton H. Wicks,* with him *James McGill Boyer,* for appellee.

OPINION BY MR. JUSTICE STERN, November 23, 1936:
This libel action arises from the publication by defendant, in the night edition of its newspaper in Pittsburgh on November 14, 1934, of the following article:

## "COYNE TRIAL TESTIMONY CHANGED

"U. S. PLEADS SURPRISE AT STAR WITNESS' VOTE STORY

"BULLETIN

"The government pleaded surprise at the testimony of one of its chief witnesses in the Coyne trial this afternoon.   Government prosecutors contended Robert K. Boyer, Mt. Lebanon Township Commissioner, had not given the same testimony he gave at the first trial.

"Today he testified Senator Coyne, on election night of 1932, had told him to look after his own interests.   At

the first trial, he admitted today, he had testified the Senator assured him 'everything will be all right.' "

In the 7-star final edition on the same evening the article appeared in the following form:

## "VOTE TRIAL EVIDENCE UPSET

### "U. S. Pleads Surprise as Coyne Witness Retells Story

"Special Federal Prosecutor Louis E. Graham pleaded surprise today at the testimony of one of the principal government witnesses in the retrial of State Senator James J. Coyne and three others on vote fraud charged.

"Graham contended that Robert K. Boyer, Mt. Lebanon Township commissioner, had changed his testimony from that given at the first trial.

"Today, Boyer testified he had seen Coyne at the William Penn Hotel and that Coyne, acknowledging the Democratic landslide, had told him:

" 'Don't worry about the head of the ticket. It's gone. Go out and look after your own interests.'

### "Early Testimony

"Prosecutor Graham produced records of the first trial showing that Boyer had testified Coyne had said:

" 'Everything will be all right.' "

The fact was that at the first trial of Senator Coyne and his co-defendants for alleged vote frauds plaintiff testified on behalf of the government that on election night, 1932, in response to a question by him as to "How is things coming?" Senator Coyne had answered: "Oh, everything is all right, everything *will be* all right," whereas at the second trial he testified that Senator Coyne had merely said: "All right." Thereupon counsel for the government pleaded surprise and asked the right to cross-examine; in support of his request, however, he did not charge any improper motive on the part of plaintiff but only "the element of faulty memory, fail-

ing to remember what was said." Receiving the necessary permission, counsel then read to plaintiff his testimony at the first trial, whereupon plaintiff at once admitted that he had so testified, that "It is possible I forgot a word or two," and that it was true the remark of Senator Coyne had included the additional statement.

Plaintiff's suit is based upon the ground that the articles as published in effect imputed perjury. The jury rendered a verdict of $6,000. Defendant's motions for judgment n. o. v. and for a new trial were overruled.

It is defendant's contention that the publication did not support the innuendo ascribed to it by plaintiff, the statement that plaintiff had "changed" his testimony not being incompatible with an honest as distinguished from a wilful and corrupt variation in the two versions of the alleged conversation with Senator Coyne.

That a publication is susceptible of an interpretation which would render it innocuous does not conclusively defeat a right of action for libel. The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them. It is for the court to determine whether a publication is fairly and reasonably *capable* of the meaning imputed to it by the innuendo, leaving it to the jury to say whether it *actually* conveys the meaning so ascribed to it. In the present case it cannot be declared as a matter of law that a prominent headline on the front page of a newspaper, captioning an article dealing with a sensational trial of public interest and alleging that the "star witness" *changed* his testimony, was reasonably incapable of being construed by the general reader—considering the cynicism of human nature—as implying perjury rather than merely a lapse of memory. Saying that a witness "changed" his testimony is not wholly different from the more vernacular statement that he

"switched" his testimony; the word "changed" implies active design, deliberate action, rather than unconscious alteration due to forgetfulness. As already stated, the ultimate responsibility of determining whether the publication was in fact defamatory lay with the jury.

Defendant relies upon the case of *Pittsburgh, Allegheny & Manchester Pass. Ry. Co. v. McCurdy,* 114 Pa. 554. There a street railway company had discharged one of its conductors, but other conductors were still allowing him to ride on his employee's ticket. The company posted in its waiting room a notice that "H. B. McCurdy has been discharged for failing to ring up all fares collected. Discharged employees are not allowed to ride on employee's tickets." McCurdy, contending that the notice charged him with embezzlement, brought an action for libel, but was not allowed to recover. The court said the failure to ring up fares might result from neglect and not necessarily from dishonesty, and it was not the defendant's fault if people drew from the statement a possible inference of criminal conduct which "the words themselves in their usual signification did not justify"; the words were "not equivocal or ambiguous," nor susceptible of any other than the meaning "which in the business was ordinarily attached to them." Whatever justification this decision has must be sought in the fact that the publication was not made to the general public but only to the employees of the company, who, being "in the business," could reasonably be expected to understand that McCurdy's discharge was merely because of inefficiency as an employee and that dishonesty was not involved. The case is not an authority for the proposition that, if a publication is capable of two interpretations, it must be judged *in mitiori sensu.* Such, it is true, was the early viewpoint of the law, but the doctrine has long been abandoned.

In the assignments of error relating to the refusal to grant a new trial defendant complains that the learned trial judge erred in his instructions to the jury in regard

to the subject of qualified privilege. The court charged that the publication enjoyed such a privilege, but later, in its opinion overruling defendant's motion for a new trial, held that the element of privilege was not in the case. This conclusion was correct, because, while ordinarily the report of judicial proceedings is privileged, such immunity is lost when the publication is accompanied by unfair and unwarranted comment: *Pittock v. O'Niell*, 63 Pa. 253, 258, 259; *Montgomery v. New Era Printing Co.*, 229 Pa. 165, 167; *Cresson v. North American Co.*, 280 Pa. 373, 376. Thus in *Hayes v. Press Co., Ltd.*, 127 Pa. 642, defendant, in publishing the fact that a judgment had been entered against plaintiff on a promissory note, employed the headline: "Hotel Proprietors Embarrassed." Plaintiff contended that this amounted to a false charge of insolvency. A verdict for plaintiff was sustained on the ground that the report as to the entry of the judgment was justified, but any privilege which otherwise might have existed was lost by the comment contained in the headline. So also in *Dorr v. United States*, 195 U. S. 138, 151, a newspaper reported a trial and in the caption designated a witness as "Perjurer." It was held that this was not privileged matter, the court saying: "The privilege extends to a full and correct report of judicial proceedings *without prejudicial comment.*" (Italics supplied.) In the present case the jury by its verdict determined that the articles, with their headlines, imputed perjury to the plaintiff. Defendant had no reasonable or probable cause to justify it in conveying such an impression, for not only had counsel for the government himself disavowed any accusation of dishonesty, but when the matter was called to plaintiff's attention he immediately corrected his testimony so that it became identical with that given by him at the first trial. Defendant's article did not state this fact; had it done so any sinister implication from its statement concerning a "change" of testimony would have been removed. It cannot, therefore, invoke the pro-

tection of privilege, and there was no issue to submit to the jury except as to whether or not the publication sustained the innuendo ascribed to it by plaintiff.

The only assignment of error which has merit is that complaining of the award of punitive damages. Plaintiff proved no special damages; there was no evidence of actual malice; whatever implication of perjury was contained in the publication was neither luridly sensational nor designedly vicious. Furthermore, plaintiff's counsel having protested to defendant, the latter, two days after the appearance of the original article, published a conspicuously headlined account of the progress of the Coyne trial in which it said that "Federal attorneys have twice pleaded surprise against witnesses, although testimony has varied but little from that of the previous trial. Once was when Robert K. Boyer, of Mt. Lebanon, a star witness for the government in both trials, *inadvertently* omitted in his latter testimony that Senator Coyne on the night of the election said to him 'everything will be all right.' Boyer when re-examined by Special Prosecutor Louis E. Graham recalled that part of his previous testimony." (Italics supplied.) This was to all intents and purposes a retraction of any previous imputation of deliberate falsehood. While the court has in mind the principle laid down in *Weglein v. Golder*, 317 Pa. 437, 441, that, "In matters involving libels, . . . the judgment of the jury, unless grossly excessive, should prevail," we can come to no conclusion other than that the verdict in the present case is so inordinately out of proportion to either plaintiff's injury or defendant's offense that justice demands a substantial abatement. Accordingly the verdict is reduced to the sum of $2,500, and, as thus modified, the judgment is affirmed.